ORIGINAL

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  RODERICK G. DORMAN (SBN 96908)
   dormanr@hbdlawyers.com
2  ALAN P. BLOCK (SBN 143783)
   blocka@hbdlawyers.com
3  THOMAS B. WATSON (SBN 181546)
   watsont@hbdlawyers.com
4  HENNIGAN, BENNETT & DORMAN LLP
   865 South Figueroa Street, Suite 2900
5  Los Angeles, California 90017
   Telephone:    (213) 694-1200
6  Facsimile:    (213) 694-1234

7  Attorneys for Plaintiff
   Walker Digital, LLC

8

9            UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11  WALKER DIGITAL, LLC,            )  Case No. CV 09-8290 GAF (PLAx)
                                    )
12                   Plaintiff,     )
                                    )
13          vs.                     )  **FIRST AMENDED COMPLAINT
                                    )  FOR PATENT INFRINGEMENT,
14  CAPITAL ONE SERVICES, LLC;      )  PERMANENT INJUNCTION, AND
    CAPITAL ONE BANK (USA), N.A.;   )  DAMAGES**
15  and CAPITAL ONE FINANCIAL       )
    CORPORATION,                    )  **DEMAND FOR JURY TRIAL**
16                                  )
                     Defendants.    )
17  _____)

18

19       For its complaint against Defendants Capital One Services, LLC; Capital One

20  Bank (USA), N.A.; and Capital One Financial Corporation (hereinafter collectively

21  "Capital One" or "Defendants"), Plaintiff Walker Digital, LLC ("Walker") alleges as

22  follows:

23  **I.    JURISDICTION AND VENUE**

24       1.    This is a civil action arising in part under laws of the United States

25  relating to patents (35 U.S.C. §§ 271, 281, 283, 284, and 285).  This court has federal

26  jurisdiction of such federal question claims pursuant to 28 U.S.C. §§ 1331 and

27  1338(a).

28

2.     Personal jurisdiction as to each defendant is proper in the State of California and in this judicial district.  Each Defendant has extensive, systematic and continuous dealings with the State of California and with this judicial district.  In addition, the acts and transactions complained of herein were intentionally carried out by each Defendant on an interactive website directed to persons residing in this State and in this judicial district and thus were made effective and had harmful effect within this State and within this district.

3.     Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(b), in that each Defendant resides in this judicial district pursuant to 28 U.S.C. § 1391(c) and in that each Defendant has committed acts of infringement in this judicial district.

## II.    THE PARTIES

4.     Plaintiff Walker is a limited liability corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at 2 High Ridge Park, Stamford, Connecticut 06905.  Walker is the owner by assignment of all rights and interests in U.S. Patent Nos. 5,970,478 (the '478 patent) and 6,374,230 (the '230 patent).

5.     Upon information and belief, Defendant Capital One Services, LLC is a limited liability corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business at 1680 Capital One Drive, McLean, Virginia 22102-3407.  Upon information and belief, Defendant Capital One Services, LLC is an operator of the Capital One Internet website, www.capitalone.com (hereinafter the "Capital One Website"), including the Card Lab feature of the website.

6.     Upon information and belief, Defendant Capital One Bank (USA), N.A. is a banking institution chartered by the Office of the Comptroller of the Currency, pursuant to the National Bank Act, with a principal place of business at 1680 Capital One Drive, McLean, Virginia 22102-3407.  Upon information and belief, Defendant

-2-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1 │ Capital One Bank (USA), N.A. reviews credit card applications and issues credit card

2 │ accounts to customers who apply for such accounts using the Capital One Website,

3 │ including, but not limited to, the Card Lab feature of the website.

4 │      7.     Upon information and belief, Defendant Capital One Financial

5 │ Corporation is a corporation duly organized and existing under the laws of the State of

6 │ Delaware, with a principal place of business at 1680 Capital One Drive, McLean,

7 │ Virginia 22102-3407.  Upon information and belief, Capital One Financial

8 │ Corporation is a financial holding company whose subsidiaries include Defendants

9 │ Capital One Services, LLC and Capital One Bank (USA), N.A. and, upon information

10 │ and belief, the acts of Defendants Capital One Services, LLC and Capital One Bank

11 │ (USA), N.A. have been and continue to be performed for the benefit of and on the

12 │ behalf of Defendant Capital One Financial Corporation.  According to the Terms and

13 │ Conditions published on the Capital One Website, Capital One Financial Corporation

14 │ and its subsidiaries provide the materials contained on the Capital One Website.

## III.    FACTS PERTINENT TO ALL CLAIMS

16 │      8.     Plaintiff Walker Digital, LLC is the parent company of Walker Digital

17 │ Management, LLC, a Stamford, Conn.-based laboratory that invents entirely new

18 │ ways for businesses, in a wide range of industries that includes retail, vending, credit

19 │ cards, security, gaming, and entertainment, to operate and serve consumers by

20 │ studying human behavior and designing unusual solutions utilizing modern

21 │ information technologies.

22 │      9.     Jay Walker is the chairman of plaintiff Walker Digital, LLC and is one of

23 │ America's best-known entrepreneurs.  Mr. Walker founded a number of successful

24 │ startups that currently have more than 60 million customers.  For example, Mr.

25 │ Walker and his team created the central innovations behind Priceline.com, the

26 │ groundbreaking "name-your-own-price" company for airline tickets, rental cars and

27 │ hotel rooms.  Now a profitable public company, Priceline.com was one of only a

28 │

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-3-

1 handful of startups in U.S. history to reach a billion dollars in annual sales in under 24

2 months.   Mr. Walker is also one of a dozen or so living inventors worldwide to hold

3 200 patents in multiple fields.

4      10.    Mr. Walker's inventions and innovations have been widely recognized.

5 He has twice been named by the editors of TIME magazine as one of the 50 most

6 influential business leaders in the digital age.  Business Week selected him as one of

7 its 25 Internet pioneers most responsible for "changing the competitive landscape of

8 almost every industry in the world."  Newsweek cited him as one of three executives

9 at the forefront of the Internet commerce revolution.

10      11.    On March 12, 1997, Jay Walker and James Jorasch filed with the United

11 States Patent and Trademark Office ("PTO") an application for a United States patent

12 for methods, apparatus, and programs for customizing credit accounts.  This patent

13 application described and claimed inventions which solved problems faced by credit

14 card issuers and customers when offering and obtaining credit accounts.

15      12.    Prior to the inventions described in the above-mentioned Walker patent

16 application, credit card customers were only ever faced with a yes-or-no decision as to

17 whether to accept or reject any offered account; there was no way for a customer to

18 choose or specify the desired parameters of a credit account.  Messrs. Walker's and

19 Jorasch's patent application solved this problem by describing and claiming inventive

20 methods and apparatus for offering customizable credit accounts, in which the

21 customer is free to choose or specify the terms or parameters of the credit account.

22      13.    The PTO carefully considered the patent application filed by Messrs.

23 Walker and Jorasch, including the claims, the specification, the drawings, the thirty-

24 three references submitted by the applicants, and the two references located by the

25 examiner, and determined that the claimed features were neither found nor suggested

26 in the prior art.  On or about September 23, 1998, the PTO, without issuing any initial

27 rejections or providing any objections or negative comments, provided notice that the

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-4-

1   originally-filed forty-eight claims were patentable and that a United States patent

2   would issue having the originally-filed forty-eight claims, in the exact form as filed by

3   Messrs. Walker and Jorasch.

4       14.    On October 19, 1999, the PTO duly and legally issued United States

5   Letters Patent No. 5,970,478, entitled "METHOD, APPARATUS, AND PROGRAM

6   FOR CUSTOMIZING CREDIT ACCOUNTS." ("the '478 patent") (A true and

7   correct copy of the '478 patent is attached hereto as Exhibit 1).

8       15.    Plaintiff Walker is the owner by assignment of the entire right, title, and

9   interest in and to the '478 patent.

10       16.    On August 9, 1999, Messrs. Walker and Jorasch filed with the PTO a

11   continuation patent application claiming priority to the application for the '478 patent.

12   This subsequent patent application contained substantially the same specification and

13   the identical drawings as the '478 patent.  On or about November 18, 1999, Messrs.

14   Walker and Jorasch filed a preliminary amendment cancelling the forty-eight claims

15   of the '478 patent and adding fourteen new claims to be examined with this

16   continuation patent application.

17       17.    The PTO carefully considered the continuation application filed by

18   Messrs. Walker and Jorasch, including the claims, the specification, the drawings, the

19   thirty-five references considered with the '478 patent, and determined that the claimed

20   features were neither found nor suggested in the prior art.  On or about June 5, 2000,

21   the PTO provided notice that the fourteen claims were patentable and that a patent

22   would issue having the originally-filed fourteen claims, in the exact form as filed by

23   Messrs. Walker and Jorasch.

24       18.    On April 16, 2002, the PTO duly and legally issued United States Letters

25   Patent No. 6,374,230, entitled "METHOD, APPARATUS, AND PROGRAM FOR

26   CUSTOMIZING CREDIT ACCOUNTS." ("the '230 patent") (A true and correct

27   copy of the '230 patent is attached hereto as Exhibit 2).

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-5-

19.   Plaintiff Walker is the owner by assignment of the entire right, title, and interest in and to the '230 patent.

20.   Currently, Defendant Capital One Financial Corporation offers a broad spectrum of financial products and services to consumers, small businesses and commercial clients.  Capital One claims to be: (1) one of the America's largest consumer franchises with approximately 45 million customer accounts; (2) one of the nation's most recognized brands; and (3) the fourth largest issuer of Visa® and MasterCard® credit cards in the United States, based on managed credit card loans outstanding.

21.   It is Capital One's corporate philosophy to use technology to provide its customers with customized financial products.  According to the Capital One Website, Defendant Capital One Financial Corporation was founded in 1988, on the belief that "the power of information, technology, testing and great people could be combined to bring highly customized financial products directly to consumers."

22.   Since at least as early as April, 2003, Capital One has known of and possessed copies of Plaintiff Walker's '478 and '230 patents.  On or about April 20, 2001, Capital One filed a patent application with the United States Patent and Trademark Office ("PTO") entitled "SYSTEM AND METHOD FOR OFFERING CUSTOMIZED CREDIT CARD PRODUCTS" (hereinafter "Capital One's customized credit card patent application").  The PTO assigned serial no. 09/838,194 to Capital One's customized credit card patent application and published the application on November 28, 2002 with Publication No. US 2002/0178113.  On or about April 23, 2003, Capital One submitted an Information Disclosure Statement to the PTO, which included both of the Walker '478 and '230 patents as prior art to the Capital One customized credit card patent application.

23.   The PTO has so far determined that the claims of Capital One's customized credit card patent application are not patentable over the prior art Walker

-6-

1  '478 patent, either by itself or in combination with another prior art reference.  In

2  response to Office Actions dated on or about December 12, 2007, July 9, 2008, and

3  November 24, 2008, Capital One argued that its then pending claims were patentable

4  over the Walker '478 patent either alone, or in combination with the prior art patent to

5  Lent.

6      24.    To date, the PTO has not indicated that the present claims of the Capital

7  One customized credit card patent application are patentable over the '478 patent or

8  that a patent will be issued to Capital One.

9      25.    By virtue of Capital One's knowledge of the '478 and '230 patents and

10  their scope, as evidenced by Capital One's submission of these patents to the PTO, by

11  Capital One's amendment to its patent application claims to overcome a rejection of

12  those claims over the '478 patent, by Capital One's arguments to the PTO examiner

13  attempting to distinguish its patent application claims from the '478 patent, and by the

14  PTO's refusal so far to allow Capital One's customized credit card application to

15  issue as a patent in view of the '478 patent, Capital One has been fully aware of the

16  following facts since at least as early as April, 2003:  (1) that Messrs. Walker and

17  Jorasch are the first and original inventors of methods and apparatus for customizing

18  credit accounts; (2) that Plaintiff Walker is the sole owner of the right to make, use,

19  sell, and offer for sale methods and apparatus for customizing credit accounts in the

20  United States, and (3) that Capital One cannot make, use, sell, or offer for sale the

21  methods and apparatus for customizing credit accounts in the United States without

22  Plaintiff Walker's authorization.

23      26.    With full knowledge of the Walker '478 and '230 patents and of the fact

24  that Capital One cannot make, use, sell, or offer for sale the methods and apparatus

25  for customizing credit accounts in the United States without Plaintiff Walker's

26  authorization, Capital One nevertheless launched the "Capital One Card Lab"

27  (hereinafter "Card Lab") some time prior to November 26, 2007.  Prior to launching

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Case No. CV 09-8290 GAF (PLAx)                    FIRST AMENDED COMPLAINT FOR PATENT
                                        INFRINGEMENT, PERMANENT INJUNCTION AND DAMAGES

773910.1

1    Card Lab, Capital One never contacted Walker to seek a license from Walker to its
2    '478 and '230 patents.

3        27.    On or about March 30, 2009, Walker gave notice to Capital One of its
4    allegation that Capital One is infringing the '478 and '230 patents.

5        28.    Capital One shut down Card Lab some time in August, 2009.

6        29.    Capital One's Card Lab was accessible to consumers in the United States
7    via Capital One's Website at http://www.capitalone.com/cardlab.  After Capital One
8    shut down Card Lab, visitors to this portion of Capital One's website are informed by
9    Capital One that, "Card Lab is unavailable. We are working on other options to offer
10   customers choice and control."

11       30.    Capital One's Card Lab was an apparatus for customizing credit
12   accounts, and, when used, performed a method for customizing credit cards.  Using
13   the Card Lab feature, a Capital One customer selected from a menu of terms and
14   options to build his or her own credit card by selecting the combination of features
15   that are most important to her.  In a press release dated November 26, 2007
16   announcing the launch of Card Lab, Capital One described the operation of Card Lab
17   as follows:

18          The Capital One Card Lab web site (www.capitalone.com/cardlab)
19          provides a series of interactive choices, where consumers can click
20          to select the options they want and need in their credit card,
21          including key account terms and the image printed on their card.
22                                  * * *
23          The Capital One Card Lab offers a whole new level of transparency
24          for consumers, who will be able to see in real-time the trade-offs
25          that are necessary to create the card that works for them. As choices
26          are made, the tool narrows the options in the remaining categories,
27          eliminating options that don't work together. For example,

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    consumers who are willing to pay an annual fee can earn rewards

2    faster.

3        31.    Capital One accompanied the launch of Card Lab with an elaborate and

4    pervasive marketing campaign, including national television, print, direct marketing,

5    and Internet advertising, which, upon information and belief, has persisted from

6    November 2007 to some time in August 2009.

7        32.    Capital One used such marketing of Card Lab beyond the mere

8    acquisition of Card Lab credit card accounts to using Card Lab to drive traffic to

9    Capital One's Website.  For example, such television, print, and direct marketing

10   advertising of Card Lab instructed the recipients of the advertising to visit Capital

11   One's Website, where the recipient could be exposed to all of the information and

12   features available on the Capital One Website, in addition to Card Lab.  The Internet

13   advertising, comprising banner advertisements placed on various third party websites,

14   is itself a hyperlink, which, when clicked on by the user, took the user directly to the

15   Card Lab portion of Capital One's Website.

16       33.    Capital One also used such marketing of Card Lab beyond the mere

17   acquisition of Card Lab credit card accounts to using Card Lab to differentiate Capital

18   One from other credit card providers and position Capital One generally as the most

19   technically advanced/internet savvy provider of credit card products and services.

20   According to Capital One's Chairman and Chief Executive Officer, Richard D.

21   Fairbank, in Capital One's 2008 Annual Report, Capital One has one of the nation's

22   most recognizable brands, with 99% total brand awareness, based on Capital One

23   "delivering industry-leading television ads and marketing creative [sic] for many

24   years."  According to Mr. Fairbank, although Capital One often features credit cards

25   in its "signature national advertising, our brand is not limited to national lending."

26       34.    Capital One's introduction of Card Lab in November 2007 was a success

27   for Capital One.  According to Mr. Fairbank, in Capital One's 2008 Annual Report,

28

-9-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  Card Lab was a "hit" with Capital One's customers:

2  > Card Lab empowers our customers to select the combination of

3  > features most important to them, including interest rates, annual

4  > fees, and rewards options.  Card Lab also enables our customers to

5  > personalize their plastics by uploading an image or photo to be

6  > displayed on the front of the credit card – whether a favorite family

7  > photo or a picture of a beloved pet.  Card Lab is a hit with our

8  > customers.  They love the exceptional value, transparency,

9  > convenience, and control.

10  35.    Capital One's introduction of its Card Lab in November 2007, together

11  with its extensive marketing and promotion of Card Lab through national television,

12  print, direct marketing, and Internet advertising, without the authority of Walker, was

13  with complete disregard for Walker's exclusive right to make, use, sell, and offer for

14  sale methods and apparatus for customizing credit accounts in the United States and

15  was to the commercial detriment of Plaintiff Walker.  When Capital One launched

16  Card Lab in November 2007, and subsequently embarked on a massive marketing

17  campaign for Card Lab, Capital One acted with full knowledge of the Walker '478

18  and '230 patents, and with full knowledge of the fact that Capital One cannot make,

19  use, sell, or offer for sale any methods and apparatus for customizing credit accounts

20  in the United States without Plaintiff Walker's authorization.  Capital One was, or at

21  the very least should have been, aware of an objectively high likelihood that its

22  manufacture and use of Card Lab constituted infringement of the Walker patents and

23  that such patents are valid.

24

25  ## CLAIM FOR RELIEF

26  **Infringement of the '478 and '230 Patents (Against All Defendants)**

27  36.    Plaintiff incorporates herein by reference the allegations set forth in

28  -10-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    paragraphs 1-35 of this Complaint as though fully set forth herein.

2        37.    Defendants directly infringed the '478 patent under 35 U.S.C. § 271(a)

3    by having made and/or used systems for customizing a credit account and by having

4    used and offered for sale methods for customizing a credit account.

5        38.    Defendants directly infringed the '230 patent under 35 U.S.C. § 271(a)

6    by having made and/or used systems for customizing a credit account and by having

7    used and offered for sale methods for customizing a credit account.

8        39.    Defendants' foregoing acts of patent infringement were willful.

9        40.    On information and belief, Defendants may infringe the '478 and '230

10   patents in the future unless enjoined by this Court.

11       41.    As a result of Defendants' infringement, Plaintiff Walker has suffered

12   monetary damages in an amount not yet determined.

13       42.    Unless a preliminary and permanent injunction are issued enjoining

14   Defendants and their agents, servants, employees, attorneys, representatives, and all

15   others acting on their behalf from infringing the '360 patent, Plaintiff will be greatly

16   and irreparably harmed.

17   ### PRAYER FOR RELIEF

18       WHEREFORE, Plaintiff Walker Digital, LLC prays for judgment against each

19   Defendant as follows:

20       (1)    For a judicial determination and declaration that each Defendant has

21   directly infringed the '478 patent;

22       (2)    For a judicial determination and declaration that each Defendant has

23   directly infringed the '230 patent;

24       (3)    For a judicial determination and decree that each of Defendants'

25   infringement of the '478 and '230 patents was willful;

26       (4)    For a judicial determination and decree that each Defendant and its

27   respective subsidiaries, officers, agents, servants, employees, licensees, and all other

28

-11-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1 persons or entities acting or attempting to act in active concert or participation with

2 them or acting on their behalf, be preliminarily and permanently enjoined from further

3 infringement of the '478 and '230 patents;

4     (5)   For a judicial decree that orders each Defendant to account for and pay to

5 Walker all damages caused to Walker by reason of each Defendants' infringement

6 pursuant to 35 U.S.C. Section 284, including enhanced damages under 35 U.S.C.

7 Section 285;

8     (6)   For an award of damages according to proof at trial;

9     (7)   For a judicial declaration that this case is exceptional under 35 U.S.C.

10 Section 285 and that Defendants be ordered to pay Walker's costs, expenses, and

11 reasonable attorney's fees pursuant to 35 U.S.C. Sections 284 and 285;

12     (8)   For a judicial order awarding to Walker pre-judgment and post-judgment

13 interest on the damages caused to it by each Defendants' infringement; and

14     (9)   For any such other and further relief as the Court may deem just and

15 proper under the circumstances.

16

17 DATED:  January 13, 2010       HENNIGAN, BENNETT & DORMAN LLP

18

19         By_____

20             Roderick G. Dorman
            Alan P. Block
            Thomas B. Watson

21         Attorneys for Plaintiff
        Walker Digital, LLC

Case No. CV 09-8290 GAF (PLAx)     FIRST AMENDED COMPLAINT FOR PATENT
                  INFRINGEMENT, PERMANENT INJUNCTION AND DAMAGES

773910.1

HENNIGAN, BENNETT & DORMAN LLP / LAWYERS / LOS ANGELES, CALIFORNIA

1

2

## **DEMAND FOR JURY TRIAL**

3      Plaintiff hereby demands a jury trial pursuant to Rule 38 of the Federal Rules of

4  Civil Procedure as to all issues so triable.

5

6  DATED:  January 13, 2010                    HENNIGAN, BENNETT & DORMAN LLP

7                                               By

8                                                    Roderick G. Dorman
                                                     Alan P. Block
9                                                    Thomas B. Watson

10                                              Attorneys for Plaintiff
                                                Walker Digital, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-13-

FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT, PERMANENT INJUNCTION AND DAMAGES

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Exhibit 1

US005970478A

# United States Patent [19]

Walker et al.

[11] Patent Number: 5,970,478

[45] Date of Patent: Oct. 19, 1999

[54] **METHOD, APPARATUS, AND PROGRAM FOR CUSTOMIZING CREDIT ACCOUNTS**

[75] Inventors: **Jay S. Walker**, Ridgefield; **James A. Jorasch**, both of Conn.

[73] Assignee: **Walker Asset Management Limited Partnership**, Stamford, Conn.

[21] Appl. No.: **08/815,224**

[22] Filed: **Mar. 12, 1997**

[51] Int. Cl.⁶ .................................................. G06F 17/00
[52] U.S. Cl. .................................. 705/35; 705/38; 705/39
[58] Field of Search .................................... 705/1, 20, 26, 705/30, 34, 35, 38, 39; 345/326, 327, 329, 335, 352; 395/200.33, 200.47, 200.49

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,724,521 | 2/1988 | Carron et al. | 395/712 |
| 4,774,664 | 9/1988 | Campbell et al. | 364/408 |
| 5,297,026 | 3/1994 | Hoffman | 364/408 |
| 5,477,040 | 12/1995 | Lalonde | 235/380 |
| 5,513,250 | 4/1996 | McAllister | 379/91 |
| 5,663,757 | 9/1997 | Morales | 348/13 |

### OTHER PUBLICATIONS

Money, Jun. 1992, vol. 21, n 6, p. 39(2), Beth Kobliner, "How to Get Better Deals on Loans and Credit Cards".
Money, Sep. 1994, vol. 23, n 9, p. 80(3), Vanessa O'Connell, "When it Pays to Wrestle With Your Banker".
Sacramento Bee, Jul. 28, 1996, "Lay Your Cards On The Table", Nancy Lloyd, p. D1.
The Houston Chronicle, Dec. 26, 1995, "Consumers lose their way in blizzard of credit card offers", Debra Fowler, p. Business 1.
Pittsburgh Post–Gazette, Feb. 4, 1996, "Card sharks", Patricia Sabatini, p. C1.
Winston–Salem Journal, Feb. 8, 1995, "Credit card features a fixed interest rate", Mark Dillon, p. C8.
Credit Card Management, Jan. 1996, vol. 8, No. 10, p. 13, "Risk–based repricing draws flak".

Federal Reserve Bulletin, Sep. 1992, vol. 78, No. 9, p. 652, "Developments in the pricing of credit card services", G.B. Canner et al.
U.P.I., Feb.5, 1992, "American Express launches new Optima card strategy", Paul Deckelman.
Los Angeles Times, Oct. 18, 1996, "Consumer Checklist/ Kathy M. Kristof; Free Round of Talks at the Bar", Kathy M. Kristof, part D, p. 3.
Business Wire, Apr. 9, 1996, "Howard I. Atkins named chief financial officer of New York Life Insurance".
Orange County Metropolitan, Dec. 15, 1994, "The Irvine solution", Jim Callahan, Sec. 1, p. 44.
The Independent, Sep. 29, 1996, "No big deal from the Pru", Steve Lodge, p. 17.
The San Diego Union–Tribune, May 8, 1988, "Pre–approved plastic provides punch for purchasing a home", Marsha Kay Seff, p. F–22.
Cards International, n 151, p. 9, Mar. 12, 1996, "Concentrating on quality".
Plain Dealer, p. 4D, Sep. 30, 1996, "Keybank USA card rates lower for fast bill payers".
American Banker, v CLXI, 187, p. 8, Sep. 30, 1996, "Key Corp Card: Higher Payments Mean Lower Rates".
Debit Card News, v 1, n 21, p 1+, Apr. 29, 1996, "A New Debit Day Dawns For Department Stores".

(List continued on next page.)

*Primary Examiner*—Thomas Peeso
*Attorney, Agent, or Firm*—Fitzpatrick, Cella, Harper & Scinto; Jeffrey L. Brandt

[57]  **ABSTRACT**

An apparatus, method, and program for customizing credit accounts and calculating an appropriate price for this customization. Customers with existing credit accounts and customers applying for new accounts can customize various parameters of their accounts, in exchange for a fee to be collected by the credit issuer. The fee may depend on the particular set of parameters selected by the customer.

**48 Claims, 7 Drawing Sheets**



Exhibit  1  Page  14

**5,970,478**

Page 2

## OTHER PUBLICATIONS

Providence Journal–Bulletin, p N/A, Apr. 10, 1996, "Two Rhode Islands banks offer credit with a philanthropic twist".

National Underwriter Property & Casualty, Jul. 8, 1996, p. 1, "Regulators Move To Curtail Two Progressive Practices".

National Underwriter Property & Casualty, Jun. 17, 1996, p. 6, "Tech Firms Look To Secure Internet–Based Transactions".

Cards International, n 163, p. 12, Sep. 17, 1996, "Big potential in a small market".

Asset–Backed Securities Week, v 2, n 32, p 1+, Aug. 5, 1996, "U.S. Issuers Invade British Credit Card Market".

Credit Card Management, v 9, n 3, p. 92+, Jun. 1996, "Here Come The Yankees".

Retail Banker International, n 347, p. 9, Apr. 24, 1996, "UK banks are 'a bunch of clowns'".

Cards International, n 148, p. 11, Jan. 30, 1996, "Preparing for the smart revolution: Part One".

Bank Technology News, v 8, n 12, p. 11, Dec. 1995, "Trust Co. Leapfrogs Into Lending On The Internet".

Cards International, n 143, p. 3, Nov. 9, 1995, "United Kingdom: Two banks launch Gold Visa cards".

Cards International, n 143, p. 2, Nov. 9, 1995, "Malaysia: Arab Bank launches first credit card".

Exhibit____1____Page___15



# FIG. 1



FIG. 2

Exhibit ___1___ Page ___17___



## FIG. 3

Exhibit____|____Page__1⁸__

PARAMETER DATABASE 27A

| ACCOUNT IDENTIFIER | INTEREST RATE | TIME PERIOD OF INTEREST RATE | MONTHLY MINIMUM PAYMENT | CREDIT LIMIT | GRACE PERIOD | PAYMENT AMNESTY | LATE FEES |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**FIG. 4**

Exhibit___1___Page___14___

**U.S. Patent**          Oct. 19, 1999          Sheet 5 of 7          **5,970,478**

CUSTOMER DATABASE 27B

| NAME | ADDRESS | SOCIAL SECURITY NUMBER | ACCOUNT IDENTIFIER | ACCOUNT BALANCE | CUSTOMER RATING |
|------|---------|------------------------|--------------------|-----------------|------------------|
|      |         |                        |                    |                 |                  |
|      |         |                        |                    |                 |                  |
|      |         |                        |                    |                 |                  |

**FIG. 5**

Exhibit ___|___ Page___20___



FIG. 6

Exhibit____ | ____ Page___ 21___



**FIG. 7**

Exhibit___1___ Page__22__

5,970,478

| 1 | 2 |

## METHOD, APPARATUS, AND PROGRAM FOR CUSTOMIZING CREDIT ACCOUNTS

### BACKGROUND OF THE INVENTION

The present invention relates generally to the field of credit accounts. More specifically, it relates to a method, apparatus, and program for modifying the terms of existing credit accounts and customizing the terms of new credit accounts to meet specific customer needs.

Credit accounts are widely used throughout the world for non-cash payments for goods and services. Typically, the authorized user of the account is issued a card and account number that can be used to charge purchases to his account. The credit card issuer (e.g., a bank) pays the merchant, and the card holder then pays the card issuer. The issuer's revenues are received by charging the merchant a fee for each transaction, and charging the card holder periodic fees and interest on unpaid balances.

From the card issuer's perspective, issuing credit cards can be a very profitable business. A good customer can generate hundreds of dollars of revenue per year. As a result, card issuers want to keep as many of their customers as they can. This is especially true for their best customers. Card issuers also want to attract new customers, in the hopes of generating additional revenue.

Credit card issuers have traditionally tried to attract new customers by advertising in banks and places of business, and by sending offers to potential customers by mail. The terms (or parameters) of these offers vary. For example, various credit card accounts offer different combinations of interest rates, credit limits, and annual fees. Many of these offers promise the customer a low introductory interest rate for a relatively short period of time, such as six months. Other offers promise rewards for card usage such as rebates on products (e.g., GENERAL MOTORS), cash rebates (e.g., DISCOVER), or frequent flyer miles (e.g., AMERICAN AIRLINES/CITIBANK). Until now, credit card issuers have typically relied on this relatively limited range of product differentiation in combination with traditional advertising to distinguish their accounts from competitor's offerings. To the best of our knowledge, credit card issuers have never tried to attract new customers by offering customizable accounts, in which the customer is free to choose the terms of the account, as a means to distinguish their product from the competition.

Perhaps more importantly, credit card issuers have never offered customizable accounts to retain existing customers that are about to switch to a competitor's card. In fact, until now, no effective way has been devised for a credit card issuer to retain an existing customer who is about to switch to a competitor's card.

The existing mechanisms for retaining customers are very limited. In certain cases, banks have been known to waive an annual fee at the request of a card holder, or even reduce the interest rate of an account. But these cases are relatively rare, and there are no automated mechanisms known to us for determining when and how to make an adjustment to the account terms in order to retain a customer.

In addition to the problems faced by the credit card issuers, customers (i.e., the card holders) face a separate set of problems. Customers with good credit histories often receive numerous offerings to sign up for new credit cards. But while customers are free to seek out an account with terms that they desire, customers have always been faced with a yes/no decision for each account—there is no way to specify the exact parameters desired. The customers' free-dom to change the terms of existing accounts is even more severely limited, as described above. In fact, under the existing system, it is impossible for certain customers to obtain all of the account terms that they desire.

While a customer can obtain new terms by switching to a new account, this can cause inconvenience in a number of ways.

First, the customer is inconvenienced by applying for the new account and closing the old account. Second, the customer is inconvenienced because he must switch any automatic payments that he has authorized (e.g., payment of his utility bill) to the new account. Third, if the card holder neglects to switch an automatic payment, he may be inconvenienced or embarrassed by interrupted service or delivery of an item that he expects to receive. Further, because the terms of the new account are predetermined, the customer may not be happy even after he has switched to a new account. The new account may not have the type of credit terms that he wants.

For customers with bad credit, the situation is even worse. While customers with good credit histories are able to switch to new accounts, customers with poor credit histories may be unable to qualify for the standard terms of any credit card issuer. As a result, the customer is unable to open a new account, and is forced to continue with the terms of his existing accounts. Worse yet, customers with weak financial credentials may be unable to qualify for any credit card. This can have significant drawbacks when trying to obtain goods or services typically available only with the use of a credit card, such as renting a car. Not having a credit card can also preclude many forms of commerce now widely practiced, such as ordering merchandise by telephone. Indeed, the desirability of having credit cards will only increase with the growth of commerce over the Internet, a medium in which physical exchanges of currency are not possible.

### SUMMARY OF THE INVENTION

One aspect of the invention is a data processing apparatus for pricing a credit account having at least one customer-specified credit parameter. This apparatus includes a CPU and a memory containing a program, to be executed by the CPU, for receiving the credit parameters and calculating a price for a corresponding credit account.

Another aspect of the invention is a method of pricing a credit account having at least one specified credit parameter. The method includes the steps of receiving the credit parameters, calculating a price for a corresponding credit account, and outputting the price.

Other aspects of the invention include a computer program and an apparatus corresponding to the method described above, and an embodiment using a central controller and a number of agent terminals. Additional aspects of the invention are directed to the central controller and the agent terminal individually.

The invention provides numerous advantages to both credit card issuers and credit card holders, by providing a method, apparatus, and program for customizing the terms of credit accounts, for both new and existing customers.

The invention benefits credit card issuers because it enables them to attract new customers by offering custom-ized credit card accounts that meet the customer's needs. It may even be used to attract new customers that might not be able to qualify for credit cards with more traditional terms. For example, a card issuer may be willing to issue a credit card with a low credit limit and a high annual fee to people with poor credit histories.

Exhibit __1__ Page __23__

5,970,478

| 3 | 4 |

The invention also benefits credit card issuers by enabling them to retain existing customers and reduce account attrition. If a customer calls to cancel his account, the card issuer may be able to rewrite the terms of the customer's existing account and thereby entice him to stay.

The invention also benefits credit card issuers by providing them with an opportunity to charge a fee for changing the terms of a customer's account.

By enabling the card issuers to attract new customers and retain existing customers, the invention can provide the card issuer with more opportunities to make a profit. This is particularly important when the invention is used to retain customers that generate large profits for the card issuer.

The invention benefits credit card holders by enabling them to find a card with credit terms that they desire, and to modify those terms as their needs change. For example, the invention can be used by a card holder who is worried about rising interest rates to lock in a fixed interest rate for a given period of time.

The invention also benefits credit card holders by eliminating the problems, described above, of switching to a new card to obtain credit terms that they need.

Further advantages and features of the invention will be apparent to those skilled in the art upon an examination of the following detailed description of preferred embodiments taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an overall system block diagram of a preferred embodiment of the present invention.

FIG. 2 is a block diagram of the central controller of FIG. 1.

FIG. 3 is a block diagram of the agent terminal of FIG. 1.

FIG. 4 is a table depicting a preferred set of fields for the parameter database of FIG. 2.

FIG. 5 is a table depicting a preferred set of fields for the customer database of FIG. 2.

FIG. 6 is a flow chart depicting initiation of account customization in the agent terminal.

FIG. 7 is a flow chart depicting the operation of the central controller.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 depicts the flow of information for customizing a pre-existing credit card account in accordance with the present invention. In this embodiment, a bank central controller 20 is linked to at least one bank agent terminal 30. Although a single agent terminal is depicted in FIG. 1, any number of agent terminals can be used. The link between each agent terminal 30 and the central controller 20 need not be a physical link—each can, for example, be linked via a modem, as described below, or any other appropriate communications channel. A transaction can be initiated from any one of the agent terminals 30. The information required to implement the transaction is passed between the agent terminal 30 and the central controller 20, until the transaction is complete.

The system depicted in FIG. 1 may be embodied in hardware specifically provided to implement the present invention. Alternatively, the system may be implemented using hardware and infrastructure that may already exist to link terminals in banks (or other locations) to a central controller being used for other purposes. Existing central

controllers may be modified to incorporate the present invention in various ways, such as by adding an additional file server (with or without a CPU dedicated to credit card customizing transactions). Alternatively, the present invention may be implemented using existing hardware entirely, by making appropriate software updates at an existing central controller and existing agent terminals, in accordance with the present invention as taught below.

Alternatively, although not so depicted in FIGS. 2 and 3, a stand-alone system can be implemented in a single location by combining the functions of the agent terminal and the central controller, and eliminating the communication links and redundant hardware.

FIG. 2 is a block diagram of a preferred central controller 20. The central controller includes a CPU 21 that performs the processing functions of the controller. It also includes a read only memory 22 (ROM) and a random access memory 23 (RAM). The ROM 22 is used to store at least some of the program instructions that are to be executed by the CPU 21, such as portions of the operating system or BIOS, and the RAM 23 is used for temporary storage of data. A clock circuit 24 provides a clock signal, which is required by the CPU 21. The use of a CPU in conjunction with ROM, RAM, and a clock circuit is well known to those skilled in the art of CPU-based electronic circuit design.

The central controller 20 also includes a communication port 25 which enables the CPU 21 to communicate with devices external to the central controller 20. In particular, the communication port 25 facilitates communication between the modem 26 and the CPU 21, so that information arriving from the modem 26 can be processed by the CPU 21, and the CPU 21 can send information to remote locations via the modem 26.

While the illustrated embodiment uses a modem 26 to communicate with devices outside the central controller 20, it should be understood that other methods of communicating with external devices may be used instead of a modem. These other methods include hard-wired connections, radio communications, optical communications, and the like.

CPU 21 can also store information to, and read information from, a data storage device 27. This data storage device 27 includes a parameter database 27a and a customer database 27b, which are described below. In addition, it includes a program 27c, which can be read and executed by the CPU 21, thereby controlling the operation of the central controller 20. While FIG. 2 depicts separate parameter and customer databases, a single database that incorporates both of those sets of data can also be used.

FIG. 3 is a block diagram of a preferred agent terminal 30, which can be located at a bank branch or office, by way of example. As discussed above, there can be any number of agent terminals 30 linked up to one central controller 20. Like the central controller 20 described above, the agent terminal 30 includes a CPU 31, ROM 32, RAM 33, and a clock circuit 34. The agent terminal 30 also includes a communication port 35 which interfaces with a modem 36 that facilitates communication between the agent terminal 30 and the central controller 20. Of course, instead of modem 36 depicted in FIG. 3, methods of communication can be used, as described above for the central controller 20. A standard computer, such as an IBM-compatible PC or an Apple Macintosh, running appropriate software, may be used as the agent terminal. Existing terminals, currently being used for other functions in banks, may also be used.

The agent terminal 30 also includes an input device in the form of a keyboard 40 and a mouse 41, connected to receive

Exhibit  1  Page  24

5,970,478

5

input from an operator. Any of a wide variety of alternative input devices would also be suitable for this purpose (including, for example, touchscreens, digitizing tablets, trackballs, and the like). The input device may interface directly with the CPU 31, as shown in FIG. 3. Alternatively, an appropriate interface circuit may be placed between the CPU 31 and the input device.

The agent terminal 30 also includes a video monitor 39 for conveying information to the operator. While the preferred video monitor 39 is a CRT, other video display devices, including LCD, LED, and thin film transistor panels, may be used as well. Individual indicators may also be used to convey information to the operator, including incandescent and neon lamps, LEDs, and the like. A video driver 38 interfaces the CPU 31 to the video monitor 39 (or to any other type of video display device).

The agent terminal 30 also includes a data storage device 37, in which a program 37c is stored. This program includes instructions that can be read by and executed by the CPU 31, thereby controlling the operation of the agent terminal 30.

FIG. 6 depicts the initiation of a transaction at an agent terminal. The steps of the process of FIG. 6 are performed at an agent terminal 30 (which, along with other hardware described below, is depicted in FIG. 3). These steps may be implemented in a computer program that may be installed at the agent terminal 30 from, for example, a computer readable medium (such as a floppy disk or CD-ROM) and then stored in the data storage device 37 (such as a hard disk drive). After being installed, the program 37c can run from the data storage device 37. Alternatively, the program 37c can run directly from the computer readable medium. As yet another alternative, not shown in the figures, the computer program may be installed at the central controller 20 from a computer readable medium and then stored therein in one or more of ROM memory 22, RAM memory 23 and the data storage device 27, for access and use by the agent terminals as required.

The process starts when a customer contacts a bank agent in step S1. The customer provides customer information in step S2. Preferably, this customer information includes an account identifier that uniquely specifies a particular credit card account. The customer selects the new credit card parameters that he wants to have in step S3. These parameters include, for example, the interest rate; credit limit and monthly minimum payment. This information is entered by the bank agent into the agent terminal 30 in step S4. The credit card parameters and the customer information are then transmitted to the central controller 20 in step S5. Alternatively, the information can be entered by the customer directly into a suitable terminal.

Each of the steps S1–S5 described above is executed by the CPU 31, which executes a program 37c stored in the data storage device 37. The communication with the central controller 20 takes place via the communication port 35 and the modem 36.

FIG. 4 depicts a preferred set of parameters pertaining to each credit card account. These parameters are stored in the parameter database 27a. When the customer selects the parameters in step S3 of FIG. 6, he selects from the available parameters. The preferred parameters include: the interest rate that is charged on unpaid balances; the time period of the interest rate, which is the amount of time for which the interest rate must remain fixed; the monthly minimum payment, which will typically be a percentage of the outstanding balance; the credit limit, which is the maximum amount of credit that the issuer will extend to the card

6

holder; the grace period, which is a period following a purchase during which interest does not accrue; payment amnesty, which records the number of times a customer is permitted to skip a monthly payment which is inconvenient to pay; and a late fee, which is a fee that is charged when a customer does not pay his bill on time.

Parameter database 27a is preferably indexed by the account identifier, linking parameter database 27a with customer database 27b. Of course, the invention is not limited to the parameters described above, and alternative parameters may be used.

FIG. 7. is a flowchart of the operation of the central controller 20 (which, along with other hardware described below, is depicted in FIG. 2). The steps of the process shown in FIG. 7 may be implemented in a computer program 27c that may be installed at the central controller 20 from a computer readable medium and then stored therein in the data storage device 27. Alternatively, the program 27c may be installed in the ROM 22 or the RAM 23.

First, in step S11, the central controller 20 receives the credit card parameters and customer parameters that were transmitted from the agent terminal 30. The central controller 20 retrieves the customer parameters corresponding to the received customer information (which is preferably an account identifier) in step S12. These retrieved customer parameters are preferably stored in the customer database 27b.

A preferred set of customer parameters for existing customers is depicted in FIG. 5. These parameters are stored in customer database 27b. This set includes each customer's name and address; an account identifier (such as a credit card number); social security number (which is commonly used to identify individuals on their credit history records); the account balance (indicating the amount of money that the customer owes to the card issuer); and a customer rating. The customer rating rates the credit of the customer. This could be based on a customer's past payment history for the account in question. Alternatively, it could be based on information obtained from a credit reporting agency such as TRW or EQUIFAX. The credit rating could also be based on other factors such as the customer's income. A three-level customer rating of good, average, and bad may be established based on any of the above-mentioned factors, and then stored in the customer database 27b. Of course, the invention is not limited to the parameters described above, and alternative parameters may be used.

Returning now to FIG. 7, the central controller 20 then calculates the price of modifying the account in step S13 based on the credit card parameters received from the agent terminal along with the customer parameters from the customer database 27b. For example, a customer requesting a lower interest rate and lower monthly payments might be charged a fee of twenty dollars.

One example of calculating a price based on some of these parameters, and the effects of each of those parameters on the price, is described below.

(1) The Interest Rate:

Decreasing the interest rate on the card will result in less revenue for the card issuer, so the customer will have to pay a premium for lowering the interest rate. A base price due to the change in interest rate can be computed by multiplying the decrease in interest rate by the expected average monthly balance for the customer by the expected life of the customer.

For example, a customer who wants to lower his interest rate by 2%, and who carries an average balance of $500, and

Exhibit    1    Page 25

5,970,478

| 7 | 8 |

who has an expected customer life of 3 years, will result in the following base:

Base=2%×$500×3=$30

(2) The Time Period of the Interest Rate:

Interest rates which are fixed over a long period of time will result in greater exposure to adverse changes in market rates, therefore the price for changing parameters will increase as the length of the fixed period of coverage increases. The following multipliers for example may be used:

| 6 months | 110% |
| 1 yr | 120% |
| 2 yr | 130% |

(3) The Monthly Minimum Payments:

Smaller minimum payments will tend to increase the risk of default, which will raise the price. The following multipliers for example may be used:

| Payments lower by 30% | 120% |
| Payments stays the same | 100% |
| Payments increase by 30% | 80% |

(4) The Credit Limit:

Higher credit limits will tend to increase the risk of default, which will raise the price. The following multipliers for example may be used:

| Decrease limit by 50% | 60% |
| Decrease limit by 25% | 80% |
| Limit stays the same | 100% |
| Increase limit by 25% | 130% |
| Increase limit by 50% | 160% |

(5) The Grace Period:

Since the card issuer does not collect interest during the grace period, extending it will require an increase in the price. The following multipliers for example may be used:

| Stays the same | 100% |
| Extend by 2 weeks | 115% |
| Extend by 1 month | 125% |
| Extend by 2 months | 140% |

A sample calculation, using these parameters, will now be described for a hypothetical customer who wants to change the parameters of an existing account. This customer wants to lower the interest rate by 2%, lock the rate in for 1 year, increase his monthly payment by 30%, decrease his credit limit by 25%, and extend his grace period by 1 month.

Base=2%×$500×3=$30 (as calculated above)

Adjustment=120%×80%×80%×125%=96%

Price=Base×Adjustment=$30×96%=$28.80

Where no adjustment to the interest rate is requested, the base cost of the change will take a different form; for example a fixed-price processing fee, or a predetermined percentage of the average monthly payment or average monthly balance.

While the calculation described above uses a simple product of various parameters, numerous other formulae may be used to arrive at a suitable price.

The price calculated based on the credit parameters may also be modified by customer parameters, such as the customer rating from the customer database (shown in FIG. 5). For example, the price may be tripled for customers with a bad credit rating, doubled for customers with an average credit rating, and left unchanged for customers with a good credit rating.

Once the price information has been calculated, it is transmitted to the customer in step S14.

In some instances, the price of modifying the account may be zero. For example, if a customer wants to increase his minimum monthly payments by 30%, the credit card company may modify his account for free. A card issuer may even be willing to pay a customer to change the terms of his account when the new terms are more profitable for the issuer. Thus, the phrase "calculating the price", or equivalent phraseology used herein to describe an exchange of value for a change in credit terms, contemplates not only the computation of a price to be paid by the customer, but also circumstances in which the price or fee may be zero, or even where the credit issuer may provide a payment or credit to the customer for accepting new terms more favorable to the credit issuer.

After the price information is transmitted to the customer in step S14, the customer decides whether the price is acceptable in step S15. If he accepts the price for modifying his account, the system can process the sale by charging the customer's credit card, in step S16. This charging can be initiated by the central controller 20, (or by the agent terminal 30) using traditional credit card transaction procedures, such as those commonly used in retail stores. Transactions processed through the agent terminal 30 may be carried out using the same modem 36 that is used to communicate with the central controller 20. Alternatively, an additional modem (not shown) may be included in the agent terminal 30 to process the credit card transactions.

Of course, alternate methods of payment may be used instead of payment by credit card, including payment by cash, check, debit card, and the like. Alternatively, the bank may bill the customer for the price of modifying his account.

Finally, the customer database 27b is modified to reflect the new account parameters in step S17. If the customer decides that the account price is not acceptable during step S15, the customer is given a chance to revise the initially selected credit card parameters in step S18. By trading off the various parameters against each other, the customer may be able to find terms that are suitable. After the customer revises the credit card parameters, the new credit card parameters are processed by the system in the same way as the original credit card parameters to generate a new price.

The processes depicted in FIGS. 6 and 7 are described above in the context of customizing existing accounts. In this situation, the pre-existing parameters of the existing account may be used in the computation of the price for setting up an account having the new set of parameters.

A similar process may be performed, with appropriate modifications, when a new account is being opened. In particular, in FIG. 6, because there is no pre-existing account, a credit card number can not be used as the customer identifier. Accordingly, a customer identifier such as a social security number, a name and address, or the like may be substituted for the credit card number. Similarly, in FIG. 7, instead of retrieving customer parameters corresponding to the credit card number, the central controller may retrieve credit history information from a credit bureau (such as TRW or EQUIFAX) using the customer identifier. Finally, because there are no pre-existing credit parameters, the price for opening a new account can not be based on those parameters. Accordingly, a set of standard parameters,

Exhibit___1___Page_26_

5,970,478

| 9 | 10 |

which the card issuer would otherwise use for a standard account with no fees, may serve as the existing parameters.

There has thus been provided a method, apparatus, and program that enables banks to offer credit card accounts with terms that can be modified to meet each customer's needs. The invention will enable card issuers to distinguish their services and products from those of their competitors. The invention accommodates these ends in a manner that maintains the profitability of the account for the bank, while meeting the changing financial needs of the customer.

In practice, the present invention will not just create a more valuable product for the customer. It will also enable the bank to maintain customers who might otherwise be tempted to leave for other credit card programs, and to attract customers who might otherwise establish an account with another bank.

While the present invention has been described above in terms of specific embodiments, it is to be understood that the invention is not limited to the disclosed embodiments. On the contrary, the present invention is intended to cover various modifications and equivalent structures included within the spirit and scope of the appended claims.

We claim:

1. A data processing apparatus for pricing a credit account having at least one customer specified credit parameter, comprising:

a central controller including a CPU and a memory operatively connected to said CPU; and

at least one terminal, adapted for communicating with said central controller, for transmitting the credit parameter to said central controller;

said memory in said central controller containing a program, adapted to be executed by said CPU, for calculating a price for a credit account having the credit parameter;

wherein said central controller receives the credit parameter from said terminal and calculates the price for the account based upon the credit parameter.

2. The apparatus according to claim 1, wherein the terminal is further adapted to transmit customer information to said central controller, and said program in said memory calculates the price of the account having the credit parameter based upon the customer information.

3. The apparatus according to claim 2, wherein the customer information comprises an account identifier that specifies a pre-existing credit account.

4. The apparatus according to claim 1, wherein said program in said memory is adapted to receive a customer acceptance via said terminal to enter into a credit account having the credit parameter and charge the customer the calculated price by debiting the customer's credit account.

5. A method of pricing a credit account having at least one customer specified credit parameter using a central controller including a CPU and a memory operatively connected to said CPU and containing a program adapted to be executed by said CPU for calculating the price of an account, and a terminal adapted for communicating with said central controller, the method comprising the steps of:

inputting the credit parameter to the central controller via the terminal;

executing the program to calculate, based on the credit parameter, a price for a credit account having the credit parameter; and

outputting the calculated price from the controller to the terminal.

6. The method according to claim 5, further comprising the step of inputting customer information to the controller

via the terminal, and wherein the step of executing the program further comprises calculating the price based on the customer information.

7. The method according to claim 5, wherein the step of inputting the customer information further comprises inputting an account identifier that specifies a pre-existing credit account.

8. A data processing apparatus for pricing a credit account having at least one customer specified credit parameter, comprising:

a CPU;

a memory operatively connected to said CPU, said memory containing a program, adapted to be executed by said CPU, for receiving the credit parameter and calculating a price for a credit account having the credit parameter; and

input/output apparatus, operatively connected to at least one of said memory and said CPU, for input of the credit parameter and for output of the price.

9. The apparatus according to claim 8, wherein said program in said memory is further adapted to receive customer information and calculate the price based upon the customer information.

10. The apparatus according to claim 9, wherein the customer information comprises an account identifier that specifies a pre-existing credit account.

11. The apparatus according to claim 9, wherein said program in said memory is adapted to retrieve customer parameters corresponding to the customer information.

12. The apparatus according to claim 9, wherein said program in said memory is adapted to retrieve credit history information for a person identified by the customer information and said program in said memory is further adapted to calculate the price based upon the credit history information.

13. The apparatus according to claim 8, wherein the program in said memory is adapted to receive a plurality of credit parameters comprising a desired credit limit, a desired interest rate, and a desired time period, and wherein said program is adapted to calculate the price based on the desired credit limit, the desired interest rate, and the desired time period.

14. The apparatus according to claim 8, wherein said program in said memory is adapted to receive a customer acceptance to enter into a credit account having the credit parameter and to charge the customer the calculated price by debiting the customer's credit account.

15. The apparatus according to claim 8, wherein the credit account is a credit card account with revolving credit terms.

16. A method of pricing a credit account having at least one customer specified credit parameter using a CPU and a memory operatively connected to said CPU and containing a program, adapted to be executed by said CPU, for calculating a price, the method comprising the steps of:

receiving the credit parameter;

executing the program in the CPU for calculating a price for a credit account having the credit parameter; and

outputting the price.

17. The method according to claim 16, further comprising the step of receiving customer information, and wherein the executing step calculates the price based on the customer information.

18. A method of pricing a credit account having at least one customer specified credit parameter, the method comprising the steps of:

receiving the credit parameter;

Exhibit ___I___ Page __27__

5,970,478

11

calculating a price for a credit account having the credit parameter; and

outputting the price.

19. The method according to claim 18, further comprising the step of receiving customer information, and wherein the calculating step calculates the price based on the customer information.

20. The method according to claim 19, wherein the customer information comprises an account identifier that specifies a pre-existing credit account.

21. The method according to claim 19, further comprising the step of retrieving customer parameters corresponding to to the customer information.

22. The method according to claim 19, further comprising the steps of retrieving a credit report for the person identified by the customer information and calculating the price based upon the credit report.

23. The method according to claim 18, wherein the receiving step comprises receiving a desired credit limit, a desired interest rate, and a desired time period, and the calculating step calculates the price based on the desired credit limit, the desired interest rate, and the desired time period.

24. The method according to claim 18, further comprising the steps of receiving a customer acceptance to enter into a credit account having the customer specified credit parameter and charging the customer the calculated price.

25. The method according to claim 18, wherein the credit account is a credit card account with revolving credit terms.

26. Computer executable process steps, stored on a computer readable medium, for pricing a credit account having at least one customer specified credit parameter, comprising:

a step to receive the credit parameter;

a step to calculate the price of a credit account having the credit parameter; and

a step to output the price.

27. The computer executable process steps according to claim 26, further comprising a step to receive customer information.

28. The computer executable process steps according to claim 26, wherein the customer information comprises an account identifier that specifies a pre-existing credit account.

29. A method of obtaining a price of a credit account having at least one customer specified credit parameter, the method comprising the steps of:

communicating to a pricing entity an inquiry on a price for a credit account having the credit parameter; and

receiving from the pricing entity a price quote for a credit account having the credit parameter.

30. The method according to claim 29, further comprising the step of agreeing to enter into a credit account having the credit parameter and to pay the quoted price.

31. The method according to claim 29, wherein said communicating step includes providing customer information.

32. A method of obtaining a price of a credit account having at least one customer specified credit parameter, the method comprising the steps of:

communicating to a pricing entity an inquiry on a price for a credit account having the credit parameter, said entity provided with a CPU and a memory operatively connected to said CPU, said memory containing a program, adapted to be executed by said CPU, for receiving the credit parameter and calculating a price for a credit account having the credit parameter based on the credit parameter; and

12

receiving from the pricing entity a price quote for a credit account having the credit parameter.

33. A data processing apparatus for pricing a credit account having at least one customer specified credit parameter, comprising:

a terminal adapted to communicate with a central controller, wherein the central contains a CPU and a memory operatively connected to the CPU, the memory containing a program, adapted to be executed by the CPU, for receiving the credit parameter and calculating a price based on the credit parameter for a credit account having the credit parameter,

wherein said terminal is adapted to transmit the credit parameter to the central controller, and further adapted to receive the price from the central controller.

34. The apparatus according to claim 33, wherein the terminal is further adapted to transmit customer information to the central controller, and wherein the central controller calculates the price of the account based upon the customer information and the credit parameter.

35. The apparatus according to claim 33, wherein said terminal is adapted to transmit a customer request to enter into the credit account having the credit parameter.

36. A data processing apparatus for pricing a credit account having at least one customer specified credit parameter, comprising:

a CPU;

a memory operatively connected to said CPU, said memory containing a program, adapted to be executed by said CPU, for receiving the customer specified credit parameter and an account identifier that specifies an existing credit account, for retrieving existing credit parameters including a credit balance for the existing credit account, and for calculating a price for converting the existing credit account by changing at least one of the existing credit parameters to match the customer specified credit parameter, wherein the price calculation is based on the customer specified credit parameter and the existing credit parameters; and

input/output apparatus, operatively connected to at least one of said memory and said CPU, for input of the customer specified credit parameter and for output of the price.

37. The apparatus according to claim 36, wherein said program in said memory is further adapted for receiving an authorization to convert the account, for replacing, in a database, the at least one of the existing credit parameters with the customer specified credit parameter, and for adding the price to the credit balance.

38. The apparatus according to claim 36, wherein said program is adapted for receiving a desired credit limit, interest rate, minimum payment, and time period; and wherein said program is further adapted for calculating the price based on the desired credit limit, interest rate, minimum payment, and time period.

39. The apparatus according to claim 36, wherein said program is further adapted for calculating the price based on parameters, retrieved from a database, selected from the group including a customer credit history, a risk of default, a current market interest rate, and the existing credit balance.

40. The apparatus according to claim 36, wherein the credit account is a credit card account with revolving credit terms.

41. A method of pricing a credit account having at least one customer specified credit parameter, the method comprising the steps of:

Exhibit  1  Page  28

5,970,478

13                                                          14

receiving the customer specified credit parameter and an account identifier that specifies an existing credit account;

retrieving existing credit parameters including a credit balance for the existing credit account;

calculating a price for converting the existing credit account by changing at least one of the existing credit parameters to match the customer specified credit parameter, wherein the price calculation is based on the customer specified credit parameter and the existing credit parameters; and

outputting the price.

42. The method according to claim 41, further comprising the steps of:

receiving an authorization to convert the account;

replacing the at least one of the existing credit parameters with the customer specified credit parameter; and

adding the price to the credit balance.

43. The method according to claim 41, wherein the step of receiving the customer specified credit parameter comprises the steps of receiving a desired credit limit, interest rate, minimum payment, and time period, and wherein the step of calculating the price is further based on the desired credit limit, interest rate, minimum payment, and time period.

44. The method according to claim 41, wherein the step of calculating the price is further based on parameters selected from the group including a customer credit history, a risk of default, a current market interest rate, and the existing credit balance.

45. The method according to claim 41, wherein the credit account is a credit card account with revolving credit terms.

46. A method of obtaining new terms for a credit account comprising the steps of:

providing an account identifier that specifies an existing credit account having existing parameters including a credit balance;

providing at least one desired credit parameter; and

receiving a price for converting the parameters of the existing credit account by changing at least one of the existing parameters to match the desired credit parameter.

47. The method according to claim 46, further comprising the steps of:

authorizing the conversion of the account; and

authorizing the addition of the price to the credit balance.

48. The method according to claim 46, wherein the credit account is a credit card account with revolving credit terms.

*    *    *    *    *

Exhibit ___1___ Page _29_

Exhibit 2

US006374230B1

(12) **United States Patent**
Walker et al.

(10) Patent No.: **US 6,374,230 B1**
(45) Date of Patent: **\*Apr. 16, 2002**

(54) **METHOD, APPARATUS AND PROGRAM FOR CUSTOMIZING CREDIT ACCOUNTS**

(75) Inventors: **Jay S. Walker**, Ridgefield; **James A. Jorasch**, Stamford, both of CT (US)

(73) Assignee: **Walker Digital, LLC**, Stamford, CT (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/365,644**

(22) Filed: **Aug. 2, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 08/815,224, filed on Mar. 12, 1997, now Pat. No. 5,970,478.

(51) Int. Cl.[7] ............................................... G04N 1/413
(52) U.S. Cl. .............................. 705/35; 705/17; 705/26
(58) Field of Search ........................... 705/1, 3, 17, 26, 705/27, 35

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,724,521 A | 2/1988 | Carron et al. |
| 4,774,664 A | 9/1988 | Campbell et al. |
| 5,297,026 A | 3/1994 | Hoffman |
| 5,477,040 A | 12/1995 | Lalonde |
| 5,513,250 A | 4/1996 | McAllister |
| 5,663,757 A | 9/1997 | Morales |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 96/22576 | \* | 7/1996 |
| WO | 96/41293 | \* | 12/1996 |
| WO | 97/04410 | \* | 2/1997 |
| WO | 98/13779 | \* | 4/1998 |

| | | | |
|---|---|---|---|
| WO | 99/21096 | \* | 9/1999 |
| WO | 00/60487 | \* | 10/2000 |

OTHER PUBLICATIONS

Corporate Cashflow, Atlanta, "Putting Off–the–Shelf Software to Work", May 1992, v. 13, 15, pp. 57+.\*
Intelligent Enterprise, "E–Business Makeover", Dec. 7, 1999, pp. 29–37.\*
Marsha Kay Seff, "Pre–approved Plastic Provides Punch for Purchasing a Home", The San Diego Union–Tribune, May 8, 1988, Real Estate Section; Ed. 1,2; at p. F–22.
Paul Deckelman, "American Express Launches New Optima Card Strategy", Copyright 1992 U. P.I., Feb. 5, 1992 Financial Section.
Beth Kobliner, "How to Get Better Deals on Loans and Credit Cards", Money Magazine, Jun. 1992 at p. 39.
Glenn B. Canner, Charles A. Luckett, Wayne C. Cook, Mark A. Peirce; "Developments in the Pricing of Credit Card Services", Federal Reserve Bulletin, Sep. 1992, vol. 78; No. 9; at p. 652.
Vanessa O'Connell, "When It Pays to Wrestle with Your Banker", Money Magazine, Sep. 1994 at p. 80.
Jim Callahan, "The Irvine Solution: By Cutting Red Tape and Being More Accommodating to Business, the City of Irvine Has Once Again Become a Center for Job Growth", Orange County Metropolitan, Dec. 15, 1994 at p. 44.
Mark Dillon, "Credit Card Features a Fixed Interest Rate", Winston–Salem Journal, Feb. 8, 1995 Section C at p. 8.

(List continued on next page.)

Primary Examiner—Thomas R. Peeso
(74) Attorney, Agent, or Firm—Kurt M. Maschoff

(57) **ABSTRACT**

An apparatus, method, and program for customizing credit accounts and calculating an appropriate price for this customization. Customers with existing credit accounts and parameters of their accounts, in exchange for a fee to be collected by the credit issuer. The fee may depend on the particular set of parameters selected by the customer.

**14 Claims, 7 Drawing Sheets**



Exhibit ___2___ Page ___30___

US 6,374,230 B1

Page 2

OTHER PUBLICATIONS

"United Kingdom: Two Banks Launch Gold Visa Cards", Cards International, Nov. 9, 1995 at p. 3.

"Malayasia: Arab Bank Launches First Credit Card", Cards International, Nov. 9, 1995 at p. 2.

"Trust Co. Leapfrogs Into Lending on the Internet; Becomes the First Banking Institution to Approve Loans over The Internet", Bank Technology News, Dec. 1, 1995 at p. 11.

Debra Fowler, "Consumers Lose Their Way in Blizzard of Credit Card Offers", The Houston Chronicle, Dec. 26, 1995, Business Section at p. 1.

"Preparing for the Smart Revolution", Cards International, Jan. 20, 1996, Feature Section at p. 11.

"Risk–based Repricing Draws Flak", Credit Card Management, Jan. 1996, vol. 8, No. 10 at p. 13.

Patricia Sabatini, "Card Sharks; Lurking in the Sea of Offers you get from Credit Card Companies are Some Nasty Surprises . . . ", Pittsburgh Post–Gazzette, Feb. 4, 1996, Business Section at p. C1.

"Howard I. Akins Named Chief Financial Officer of New York Life Insurance; Five Senior Vice Presidents Elected", Business Wire, Apr. 9, 1996.

John Kostrzewa, "Two Banks Offer Credit With a Philanthropic Twist", Providence Journal–Bulletin, Apr. 10, 19956 at p. H1.

"UK Banks are 'a Bunch of Clowns'", Retail Banker International, Apr. 24, 1996 at p. 9.

"A New Debit Day Dawns for Department Totes", Debit Card News, Apr. 29, 1996.

Richard Rolfe, "Here Come The Yankees", Credit Card Management, Jun. 1996 at p. 92–98.

Diane West, "Tech Firms Look to Secure Internet–Based Transactions", National Underwriter, Property & Casualty/ Risk & Benefits Management Edition, Jul. 17, 1996 The Web Page Section at p. 6.

L. H. Otis, "Regulators Move to Curtail Two Progressive Practices", National Underwriter, Property & Casualty/Risk & Benefits Management Edition, Jul. 8, 1996 at p. 1.

Nancy Lloyd, "Lay Your Cards On The Table", Sacramento Bee, Jul. 28, 1996, Metro Final, Scene Section at p. D1.

"U. S. Issuers Invade British Credit Card Market", Copyright 1996 American Banker, Asset–Backed Securities Week, vol. 2, No. 32 at p. 1.

"Big Potential in a Small Market", Cards International, Sep. 17, 1996, Feature Section at p. 12.

Steve Lodge, "No Big Deal From the Pru", The Independent, Sep. 29, 1996, Business Section at p. 17.

Miriam Hill, "Keybank USA Card Rates Lower for Fast Bill Payers", The Plain Dealer, Sep. 30, 1996 Personal Finance Section at p. 4D.

Jeffrey Kutler, "KeyCorp Card: Higher Payments Mean Lower Rates", The American Banker, Sep. 30, 1996, Credit/ Debit/ATMS Section at p. 8.

Kathy M. Kristof, "Consumer Checklist/Kathy M. Kristof; Free Round of Talks at the Bar", Los Angeles Times, Oct. 18, 1996, Home Edition, Business Section; Part D at p. 3.

"Concentrating on Quality", Cards International, Mar. 12, 1996 Feature Section at p. 9.

* cited by examiner

Exhibit__2__Page__31__



## FIG. 1

Exhibit _2_ Page _32_

BANK CENTRAL CONTROLLER





FIG. 2

Exhibit 2 Page 33



# FIG. 3

Exhibit _2_ Page _34_

PARAMATER DATABASE

| INTEREST RATE | TIME PERIOD OF INTEREST RATE | MONTHLY MINIMUM PAYMENT | CREDIT LIMIT | GRACE PERIOD | PAYMENT AMNESTY | VARIABLE FINANCE CHARGE |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

FIG. 4

Exhibit __2__ Page __35__

CUSTOMER DATABASE

| NAME | ADDRESS | SOCIAL SECURITY NUMBER | ACCOUNT NUMBER | ACCOUNT BALANCE | CUSTOMER RATING |
|------|---------|------------------------|----------------|-----------------|-----------------|
|      |         |                        |                |                 |                 |
|      |         |                        |                |                 |                 |
|      |         |                        |                |                 |                 |

FIG. 5

Exhibit  2  Page 36



FIG. 6

Exhibit _2_ Page _37_



FIG. 7

Exhibit __2__ Page __38__

US 6,374,230 B1

1

# METHOD, APPARATUS AND PROGRAM FOR CUSTOMIZING CREDIT ACCOUNTS

This application is a continuation of Ser. No. 08/815,224 filed Mar. 12, 1997 now U.S. Pat. No. 5,970,478.

## BACKGROUND OF THE INVENTION

The present invention relates generally to the field of credit accounts. More specifically, it relates to a method, apparatus, and program for modifying the terms of existing credit accounts and customizing the terms of new credit accounts to meet specific customer needs.

Credit accounts are widely used throughout the world for non-cash payments for goods and services. Typically, the authorized user of the account is issued a card and account number that can be used to charge purchases to his account. The credit card issuer (e.g., a bank) pays the merchant, and the card holder then pays the card issuer. The issuer's revenues are received by charging the merchant a fee for each transaction, and charging the card holder periodic fees and interest on unpaid balances.

From the card issuer's perspective, issuing credit cards can be a very profitable business. A good customer can generate hundreds of dollars of revenue per year. As a result, card issuers want to keep as many of their customers as they can. This is especially true for their best customers. Card issuers also want to attract new customers, in the hopes of generating additional revenue.

Credit card issuers have traditionally tried to attract new customers by advertising in banks and places of business, and by sending offers to potential customers by mail. The terms (or parameters) of these offers vary. For example, various credit card accounts offer different combinations of interest rates, credit limits, and annual fees. Many of these offers promise the customer a low introductory interest rate for a relatively short period of time, such as six months. Other offers promise rewards for card usage such as rebates on products (e.g., GENERAL MOTORS), cash rebates (e.g., DISCOVER), or frequent flyer miles (e.g., AMERICAN AIRLINES/CITIBANK). Until now, credit card issuers have typically relied on this relatively limited range of product differentiation in combination with traditional advertising to distinguish their product from competitor's offerings. To the best of our knowledge, credit card issuers have never tried to attract new customers by offering customizable accounts, in which the customer is free to choose the terms of the account, as a means to distinguish their product from the competition.

Perhaps more importantly, credit card issuers have never offered customizable accounts to retain existing customers that are about to switch to a competitor's card. In fact, until now, no effective way has been devised for a credit card issuer to retain an existing customer who is about to switch to a competitor's card.

The existing mechanisms for retaining customers are very limited. In certain cases, banks have been known to waive an annual fee at the request of a card holder, or even reduce the interest rate of an account. But these cases are relatively rare, and there are no automated mechanisms known to us for determining when and how to make an adjustment to the account terms in order to retain a customer.

In addition to the problems faced by the credit card issuers, customers (i.e., the card holders) face a separate set of problems. Customers with good credit histories often receive numerous offerings to sign up for new credit cards. But while customers are free to seek out an account with

2

terms that they desire, customers have always been faced with a yes/no decision for each account—there is no way to specify the exact parameters desired. The customers' freedom to change the terms of existing accounts is even more severely limited, as described above. In fact, under the existing system, it is impossible for certain customers to obtain all of the account terms that they desire.

While a customer can obtain new terms by switching to a new account, this can cause inconvenience in a number of ways. First, the customer is inconvenienced by applying for the new account and closing the old account. Second, the customer is inconvenienced because he must switch any automatic payments that he has authorized (e.g., payment of his utility bill) to the new account. Third, if the card holder neglects to switch an automatic payment, he may be inconvenienced or embarrassed by interrupted service or delivery of an item that he expects to receive. Further, because the terms of the new account are predetermined, the customer may not be happy even after he has switched to a new account. The new account may not have the type of credit terms that he wants.

For customers with bad credit, the situation is even worse. While customers with good credit histories are able to switch to new accounts, customers with poor credit histories may be unable to qualify for the standard terms of any credit card issuer. As a result, the customer is unable to open a new account, and is forced to continue with the terms of his existing accounts. Worse yet, customers with weak financial credentials may be unable to qualify for any credit card. This can have significant drawbacks when trying to obtain goods or services typically available only with the use of a credit card, such as renting a car. Not having a credit card can also preclude many forms of commerce now widely practiced, such as ordering merchandise by telephone. Indeed, the desirability of having credit cards will only increase with the growth of commerce over the Internet, a medium in which physical exchanges of currency are not possible.

## SUMMARY OF THE INVENTION

One aspect of the invention is a data processing apparatus for pricing a credit account having at least one customer-specified credit parameter. This apparatus includes a CPU and a memory containing a program, to be executed by the CPU, for receiving the credit parameters and calculating a price for a corresponding credit account.

Another aspect of the invention is a method of pricing a credit account having at least one specified credit parameter. The method includes the steps of receiving the credit parameters, calculating a price for a corresponding credit account, and outputting the price.

Other aspects of the invention include a computer program and an apparatus corresponding to the method described above, and an embodiment using a central controller and a number of agent terminals. Additional aspects of the invention are directed to the central controller and the agent terminal individually.

The invention provides numerous advantages to both credit card issuers and credit card holders, by providing a method, apparatus, and program for customizing the terms of credit accounts, for both new and existing customers.

The invention benefits credit card issuers because it enables them to attract new customers by offering customized credit card accounts that meet the customer's needs. It may even be used to attract new customers that might not be able to qualify for credit cards with more traditional terms. For example, a card issuer may be willing to issue a credit

Exhibit _2_ Page _39_

US 6,374,230 B1

**3**

card with a low credit limit and a high annual fee to people with poor credit histories.

The invention also benefits credit card issuers by enabling them to retain existing customers and reduce account attrition. If a customer calls to cancel his account, the card issuer may be able to rewrite the terms of the customer's existing account and thereby entice him to stay.

The invention also benefits credit card issuers by providing them with an opportunity to charge a fee for changing the terms of a customer's account.

By enabling the card issuers to attract new customers and retain existing customers, the invention can provide the card issuer with more opportunities to make a profit. This is particularly important when the invention is used to retain customers that generate large profits for the card issuer.

The invention benefits credit card holders by enabling them to find a card with credit terms that they desire, and to modify those terms as their needs change. For example, the invention can be used by a card holder who is worried about rising interest rates to lock in a fixed interest rate for a given period of time.

The invention also benefits credit card holders by eliminating the problems, described above, of switching to a new card to obtain credit terms that they need.

Further advantages and features of the invention will be apparent to those skilled in the art upon an examination of the following detailed description of preferred embodiments taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an overall system block diagram of a preferred embodiment of the present invention.

FIG. 2 is a block diagram of the central controller of FIG. 1.

FIG. 3 is a block diagram of the agent terminal of FIG. 1.

FIG. 4 is a table depicting a preferred set of fields for the parameter database of FIG. 2.

FIG. 5 is a table depicting a preferred set of fields for the customer database of FIG. 2.

FIG. 6 is a flow chart depicting initiation of account customization in the agent terminal.

FIG. 7 is a flow chart depicting the operation of the central controller.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 depicts the flow of information for customizing a pre-existing credit card account in accordance with the present invention. In this embodiment, a bank central controller 20 is linked to at least one bank agent terminal 30. Although a single agent terminal is depicted in FIG. 1, any number of agent terminals can be used. The link between each agent terminal 30 and the central controller need not be a physical link—each can, for example, be linked via modem, as described below, or any other appropriate communications channel. A transaction can be initiated from any one of the agent terminals 30. The information required to implement the transaction is passed between the agent terminal 30 and the central controller 20, until the transaction is complete.

The system depicted in FIG. 1 may be embodied in hardware specifically provided to implement the present invention. Alternatively, the system may be implemented using hardware and infrastructure that may already exist to link terminals in banks (or other locations) to a central

**4**

controller being used for other purposes. Existing central controllers may be modified to incorporate the present invention in various ways, such as by adding an additional file server (with or without a CPU dedicated to credit card customizing transactions). Alternatively, the present invention may be implemented using existing hardware entirely, by making appropriate software updates at an existing agent terminal and existing agent terminals,in accordance with the present invention as taught below.

Alternatively, although not so depicted in FIGS. 2 and 3, a stand-alone system can be implemented in a single location by combining the functions of the agent terminal and the central controller, and eliminating the communication links and redundant hardware.

FIG. 2 is a block diagram of a preferred central controller 20. The central controller includes a CPU 21 that performs the processing functions of the controller. It also includes a read only memory 22 (ROM) and a random access memory 23 (RAM). The ROM 22 is used to store at least some of the program instructions that are to be executed by the CPU 21, such as portions of the operating system or BIOS, and the RAM. 23 is used for temporary storage of data. A clock circuit 24 provides a clock signal, which is required by the CPU 21. The use of a CPU in conjunction with ROM, RAM, and a clock circuit is well known to those skilled in the art of CPU-based electronic circuit design.

The central controller 20 also includes a communication port 25 which enables the CPU 21 to communicate with devices external to the central controller 20. In particular, the communication port 25 facilitates communication between the modem 26 and the CPU 21, so that information arriving from the modem 26 can be processed by the CPU 21, and the CPU 21 can send information to remote locations via the modem 26.

While the illustrated embodiment uses a modem 26 to communicate with devices outside the central controller 20, it should be understood that other methods of communicating with external devices may be used instead of a modem. These other methods include hard-wired connections, radio communications, optical communications, and the like.

CPU 21 can also store information to, and read information from, a data storage device 27. This data storage device 27 includes a parameter database 27a and a customer database 27b, which are described below. In addition, it includes a program 27c, which can be read and executed by the CPU 21, thereby controlling the operation of the central controller 20. While FIG. 2 depicts separate parameter and customer databases, a single database that incorporates both of those sets of data can also be used.

FIG. 3 is a block diagram of a preferred agent terminal 30, which can be located at a bank branch or office, by way of example. As discussed above, there can be any number of agent terminals 30 linked up to one central controller 20. Like the central controller 20 described above, the agent terminal 30 includes a CPU 31, ROM 32, RAM 33, and a clock circuit 34. The agent terminal 30 also includes a communication port 35 which interfaces with a modem 36 that facilitates communication between the agent terminal 30 and the central controller 20. Of course, instead of modem 36 depicted in FIG. 3, methods of communication can be used, as described above for the central controller 20. A standard computer, such as an IBM-compatible PC or an Apple Macintosh, running appropriate software, may be used as the agent terminal. Existing terminals, currently being used for other functions in banks, may also be used.

The agent terminal 30 also includes an input device in the form of a keyboard 40 and a mouse 41, connected to receive

Exhibit __2__ Page __40__

US 6,374,230 B1

**5**

input from an operator. Any of a wide variety of alternative input devices would also be suitable for this purpose (including, for example, touchscreens, digitizing tablets, trackballs, and the like). The input device may interface directly with the CPU 31, as shown in FIG. 3. Alternatively, an appropriate interface circuit may be placed between the CPU 31 and the input device.

The agent terminal 30 also includes a video monitor 39 for conveying information to the operator. While the preferred video monitor 39 is a CRT, other video display devices, including LCD, LED, and thin film transistor panels, may be used as well. Individual indicators may also be used to convey information to the operator, including incandescent and neon lamps, LEDs, and the like. A video driver 38 interfaces the CPU 31 to the video monitor 39 (or to any other type of video display device).

The agent terminal 30 also includes a data storage device 37, in which a program 37c is stored. This program includes instructions that can be read by and executed by the CPU 31, thereby controlling the operation of the agent terminal 30.

FIG. 6 depicts the initiation of a transaction at an agent terminal. The steps of the process of FIG. 6 are performed at an agent terminal 30 (which, along with other hardware described below, is depicted in FIG. 3). These steps may be implemented in a computer program that may be installed at the agent terminal 30 from, for example, a computer readable medium (such as a floppy disk or CD-ROM) and then stored in the data storage device 37 (such as a hard disk drive). After being installed, the program 37c can run from the data storage device 37. Alternatively, the program 37c can run directly from the computer readable medium. As yet another alternative, not shown in the figures, the computer program may be installed at the central controller 20 from a computer readable medium and then stored therein in one or more of ROM memory 22, RAM memory 23 and the data storage device 27, for access and use by the agent terminals as required.

The process starts when a customer contacts a bank agent in step S1. The customer provides customer information in step S2. Preferably, this customer information includes an account identifier that uniquely specifies a particular credit card account. The customer selects the new credit card parameters that he wants to have in step S3. These parameters include, for example, the interest rate, credit limit and monthly minimum payment. This information is entered by the bank agent into the agent terminal 30 in step S4. The credit card parameters and the customer information are then transmitted to the central controller 20 in step S5. Alternatively, the information can be entered by the customer directly into a suitable terminal. Each of the steps S1–S5 described above is executed by the CPU 31, which executes a program 37c stored in the data storage device 37. The communication with the central controller 20 takes place via the communication port 35 and the modem 36.

FIG. 4 depicts a preferred set of parameters pertaining to each credit account. These parameters are stored in the parameter database 27a. When the customer selects the parameters in step S3 of FIG. 6, he selects from the available parameters. The preferred parameters include: the interest rate that is charged on unpaid balances; the time period of the interest rate, which is the amount of time for which the interest rate must remain fixed; the monthly minimum payment, which will typically be a percentage of the outstanding balance; the credit limit, which is the maximum amount of credit that the issuer will extend to the card holder; the grace period, which is a period following a

**6**

purchase during which interest does not accrue; payment amnesty, which records the number of times a customer is permitted to skip a monthly payment which is inconvenient to pay; and a late fee, which is a fee that is charged when a customer do not pay his bill on time.

Parameter database 27a is preferably indexed by the account identifier, linking parameter database 27a with customer database 27b. Of course, the invention is not limited to the parameters described above, and alternative parameters may be used.

FIG. 7. is a flowchart of the operation of the central controller 20 (which, along with other hardware described below, is depicted in FIG. 2). The steps of the process shown in FIG. 7 may be implemented in a computer program 27c that may be installed at the central controller 20 from a computer readable medium and then stored therein in the data storage device 27. Alternatively, the program 27c may be installed in the ROM 22 or the RAM 23.

First, in step S11, the central controller 20 receives the credit card parameters and customer parameters that were transmitted from the agent terminal 30. The central controller 20 retrieves the customer parameters corresponding to the received customer information (which is preferably an account identifier) in step S12. These retrieved customer parameters are preferably stored in the customer database 27b.

A preferred set of customer parameters for existing customers is depicted in FIG. 5. These parameters are stored in customer database 27b. This set includes each customer's name and address; an account identifier (such as a credit card number); social security number (which is commonly used to identify individuals on their credit history records); the account balance (indicating the amount of money that the customer owes to the card issuer); and a customer rating. The customer rating rates the credit of the customer. This could be based on a customer's past payment history for the account in question. Alternatively, it could be based on information obtained from a credit reporting agency such as TRW or EQUIFAX. The credit rating could also be based on other factors such as the customer's income. A three-level customer rating of good, average, and bad may be established based on any of the above-mentioned factors, and then stored in the customer database 27b. Of course, the invention is not limited to the parameters described above, and alternative parameters may be used.

Returning now to FIG. 7, the central controller 20 then calculates the price of modifying the account in step S13 based on the credit card parameters received from the agent terminal along with the customer parameters from the customer database 27b. For example, a customer requesting a lower interest rate and lower minimum payments might be charged a fee of twenty dollars.

One example of calculating a price based on some of these parameters, and the effects of each of those parameters on the price, is described below.

(1) The interest rate: Decreasing the interest rate on the card will result in less revenue for the card issuer, so the customer will have to pay a premium for lowering the interest rate. A base price due to the change in interest rate can be computed by multiplying the decrease in interest rate by the expected average monthly balance for the customer by the expected life of the customer.

For example, a customer who wants to lower his interest rate by 2%, and who carries an average balance of $500, and who has an expected customer life of 3 years, will result in the following base:

Exhibit___2___Page___41___

US 6,374,230 B1

| 7 | 8 |

Base=2%×$500×3=$30

(2) The time period of the interest rate: Interest rates which are fixed over a long period of time will result in greater exposure to adverse changes in market rates, therefore the price for changing parameters will increase as the length of the fixed period of coverage increases. The following multipliers for example may be used:

| | |
|---|---|
| 6 months | 110% |
| 1 yr | 120% |
| 2 yr | 130% |

(3) The monthly minimum payments: Smaller minimum payments will tend to increase the risk of default, which will raise the price. The following multipliers for example may be used:

| | |
|---|---|
| Payments lower by 30% | 120% |
| Payments stays the same | 100% |
| Payments increase by 30% | 80% |

(4) The credit limit: Higher credit limits will tend to increase the risk of default, which will raise the price. The following multipliers for example may be used:

| | |
|---|---|
| Decrease limit by 50% | 60% |
| Decrease limit by 25% | 80% |
| Limit stays the same | 100% |
| Increase limit by 25% | 130% |
| Increase limit by 50% | 160% |

(5) The grace period: Since the card issuer does not collect interest during the grace period, extending it will require an increase in the price. The following multipliers for example may be used:

| | |
|---|---|
| Stays the same | 100% |
| Extend by 2 weeks | 115% |
| Extend by 1 month | 125% |
| Extend by 2 months | 140% |

A sample calculation, using these parameters, will now be described for a hypothetical customer who wants to change the parameters of an existing account. This customer wants to lower the interest rate by 2%, lock the rate in for 1 year, increase his monthly payment by 30%, decrease his credit limit by 25%, and extend his grace period by 1 month.

Base=2%×$500×3=$30 (as calculated above)

Adjustment=120%×80%×80%×125%=96%

Price=Base×Adjustment=$30×96%=$28.80

Where no adjustment to the interest rate is requested, the base cost of the change will take a different form; for example a fixed-price processing fee, or a predetermined percentage of the average monthly payment or average monthly balance.

While the calculation described above uses a simple product of various parameters, numerous other formulae may be used to arrive at a suitable price.

The price calculated based on the credit parameters may also be modified by customer parameters, such as the customer rating from the customer database (shown in FIG. 5). For example, the price may be tripled for customers with a bad credit rating, doubled for customers with an average credit rating, and left unchanged for customers with a good credit rating.

Once the price information has been calculated, it is transmitted to the customer in step S14.

In some instances, the price of modifying the account may be zero. For example, if a customer wants to increase his minimum monthly payments by 30%, the credit card company may modify his account for free. A card issuer may even be willing to pay a customer to change the terms of his account when the new terms are more profitable for the issuer. Thus, the phrase "calculating the price", or equivalent phraseology used herein to describe an exchange of value for a change in credit terms, contemplates not only the computation of a price to be paid by the customer, but also circumstances in which the price or fee may be zero, or even where the credit issuer may provide a payment or credit to the customer for accepting new terms more favorable to the credit issuer.

After the price information is transmitted to the customer in step S14, the customer decides whether the price is acceptable in step S15. If he accepts the price for modifying his account, the system can process the sale by charging the customer's credit card, in step S16. This charging can be initiated by the central controller 20, (or by the agent terminal 30) using traditional credit card transaction procedures, such as those commonly used in retail stores. Transactions processed through the agent terminal 30 may be carried out using the same modem 36 that is used to communicate with the central controller 20. Alternatively, an additional modem (not shown) may be included in the agent terminal 30 to process the credit card transactions.

Of course, alternate methods of payment may be used instead of payment by credit card, including payment by cash, check, debit card, and the like. Alternatively, the bank may bill the customer for the price of modifying his account.

Finally, the customer database 27b is modified to reflect the new account parameters in step S17. If the customer decides that the account price is not acceptable during step S15, the customer is given a chance to revise the initially selected credit card parameters in step S18. By trading off the various parameters against each other, the customer may be able to find terms that are suitable. After the customer revises the credit card parameters, the new credit card parameters are processed by the system in the same way as the original credit card parameters to generate a new price.

The processes depicted in FIGS. 6 and 7 are described above in the context of customizing existing accounts. In this situation, the pre-existing parameters of the existing account may be used in the computation of the price for setting up an account having the new set of parameters.

A similar process may be performed, with appropriate modifications, when a new account is being opened. In particular, in FIG. 6, because there is no pre-existing account, a credit card number can not be used as the customer identifier. Accordingly, a customer identifier such as a social security number, a name and address, or the like may be substituted for the credit card number. Similarly, in FIG. 7, instead of retrieving customer parameters corresponding to the credit card number, the central controller may retrieve credit history information from a credit bureau (such as TRW or EQUIFAX) using the customer identifier. Finally, because there are no pre-existing credit parameters,

Exhibit_2_Page_42

US 6,374,230 B1

9

the price for opening a new account can not be based on those parameters. Accordingly, a set of standard parameters, which the card issuer would otherwise use for a standard account with no fees, may serve as the existing parameters.

There has thus been provided a method, apparatus, and program that enables banks to offer credit card accounts with terms that can be modified to meet each customer's needs. The invention will enable card issuers to distinguish their services and products from those of their competitors. The invention accommodates these ends in a manner that maintains the profitability of the account for the bank, while meeting the changing financial needs of the customer.

In practice, the present invention will not just create a more valuable product for the customer. It will also enable the bank to maintain customers who might otherwise be tempted to leave for other credit card programs, and to attract customers who might otherwise establish an account with another bank.

While the present invention has been described above in terms of specific embodiments, it is to be understood that the invention is not limited to the disclosed embodiments. On the contrary, the present invention is intended to cover various modifications and equivalent structures included within the spirit and scope of the appended claims.

We claim:

1. A method for negotiating parameters of a credit account, the method comprising:

receiving a request for a desired credit account, the request including at least a first requested account parameter;

comparing the at least first requested account parameter with a set of available parameters to calculate a price for a proposed credit account responsive to the request; and

submitting a proposal to a customer, the proposal including the price for the proposed credit account.

2. The method of claim 1, further comprising:

receiving a customer acceptance of the proposal.

3. The method of claim 1, further comprising:

receiving a customer denial of the proposal.

4. The method of claim 1, wherein the request further comprises a set of customer information.

5. The method of claim 4, wherein the price for the proposed credit account is calculated based on the at least one available account parameter and the set of customer information.

6. The method of claim 4, wherein the set of customer information comprises an account identifier that specifies a pre-existing credit account.

7. The method of claim 1, wherein the price for the proposed credit account is calculated based on the at least one available account parameter.

8. The method of claim 1, wherein the price for the proposed credit account includes a monetary inducement to the customer.

9. The method of claim 1, wherein the first requested account parameter is selected from at least the following

10

parameters: (i) a desired credit limit; (ii) a desired interest rate; and (iii) a desired time period.

10. The method of claim 4, further comprising retrieving customer parameters corresponding to the customer information.

11. The method of claim 4, further comprising retrieving credit history information for a person identified by the customer information, the method further comprising the step of:

calculating the price based upon the credit history information.

12. A data processing apparatus for negotiating terms of a credit account with a customer, wherein the customer requests a desired credit account having at least a first customer-selected account parameter, comprising:

a memory storing a program;

a processor in communication with the memory;

wherein the processor is directed by the program to:

compare the at least first customer-selected account parameter with a set of available parameters to calculate a price for a proposed credit account responsive to the customer request; and

forward a proposal to the customer, the proposal including the price for the proposed credit account, wherein the price is based in part upon the at least first customer-selected parameter.

13. An apparatus for negotiating terms of a credit account with a customer, wherein the customer requests a desired credit account, comprising:

means for receiving a customer message containing information regarding the desired credit account including at least a first customer-selected account parameter;

means for comparing the at least first customer-selected account parameter with a set of available parameters to calculate a price for a proposed credit account having the at least first customer-selected account parameter; and

means for forwarding a proposal to the customer, the proposal including a price for the proposed credit account;

wherein the price is based in part upon the at least first customer-selected parameter.

14. A computer-readable medium storing computer-readable instructions that direct a microprocessor to:

receive a request for a desired credit account from a customer, the request including at least a first requested account parameter;

compare the at least first requested account parameter with a set of available parameters to calculate a price for a proposed credit account having the at least first requested account parameter; and

submit a proposal to the customer, the proposal including the price for the proposed credit account.

* * * * *

Exhibit 2 Page 43

1

# PROOF OF SERVICE

I declare as follows:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 865 South Figueroa Street, Suite 2900, Los Angeles, California 90017. On January 13, 2010, I served the foregoing document described as **FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT, PERMANENT INJUNCTION, AND DAMAGES; DEMAND FOR JURY TRIAL** on the interested parties in this action follows:

☒   by placing the document listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☒   by electronic transmission. I caused the document(s) listed above to be transmitted by electronic mail to the individuals on the service list as set forth below.

Charles S. Barquist - CBarquist@mofo.com
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California 90013-1024

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postal meter date is more than one day after date of deposit for mailing in affidavit.

Executed on January 13, 2010 at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Lisa Spears-McCorry